[No. 56717–4.   En Banc.   December 6, 1990.]

ST. FRANCIS EXTENDED HEALTH CARE, *Respondent,* v.
THE DEPARTMENT OF SOCIAL AND HEALTH
SERVICES, *Appellant.*

*Kenneth O. Eikenberry, Attorney General,* and *Gretchen M. Leanderson, Assistant,* for appellant.

*Inslee, Best, Doezie & Ryder, P.S.,* by *Thomas H. Grimm,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

At issue in this case is the proper methodology for determining the financing allowance portion of the return on investment reimbursement for a nursing home operator's land lease under the Nursing Home Auditing and Cost Reimbursement Act of 1980 (RCW 74.46). Although this issue is a narrow and technical one, during the course of oral argument before this court the Assistant Attorney

General estimated that statewide it involves $1.3 million of state funds a year.

The appellant, Department of Social and Health Services (DSHS), is the administrative agency for the State of Washington which administers the Medicaid program under RCW 74.46. The respondent, St. Francis Extended Health Care (hereinafter St. Francis) is a husband–wife partnership which operates a nursing facility located in Bellingham, Washington.

The administrative law judge made findings of fact which were adopted by the administrative review judge. They are not here disputed, therefore, are deemed verities on this appeal.[1]

St. Francis contracted with DSHS to provide nursing home care to recipients of federally aided medical assistance under the Medicaid program. Pursuant to that contract, St. Francis is reimbursed in accordance with the reimbursement system set forth in the Nursing Homes Auditing and Cost Reimbursement Act of 1980 (RCW 74.46) and the Washington Administrative Code (WAC) 388–96.

In 1984, St. Francis leased 4.5 acres of land from the Sisters of St. Joseph of Newark, now known as the Sisters of St. Joseph of Peace (hereinafter referred to as the lessors) on which to build its nursing home. The leased land is a portion of a larger 55–acre parcel which was developed by the lessors as a "health care campus", and which also includes a major hospital, retirement home and a number of clinics.

The lessors had purchased the undeveloped 55–acre parcel in 1960 for approximately $117,000. The amount the lessors expended in preparing and improving the site is unknown except to the extent it is available from public records. Before entering the land lease with St. Francis, the lessors had the 4.5 acres appraised by a qualified appraiser.

---

[1]*United Nursing Homes, Inc. v. McNutt,* 35 Wn. App. 632, 635, 669 P.2d 476, *review denied,* 100 Wn.2d 1030 (1983).

That parcel was appraised at $1,176,000 as of April 7, 1984. DSHS, through the Department of General Administration, engaged another appraiser, a Mr. Randall, who testified that the property's value was $588,000 as of April 1, 1985. The administrative law judge found Mr. Randall to be credible and concluded that his testimony represented the best evidence of the April 1985 fair market value of an improved site for a comparably sized nursing home in the Bellingham area not necessarily located adjacent to a hospital.

The lessors leased the 4.5 acres to St. Francis for 50 years at $75,000 per annum ($6,250 per month) with payments commencing May 15, 1984. The certified public accountant for St. Francis testified that the capitalized cost of the lease was $710,451 based upon financial accounting standards and 10.5 percent assumed interest.

The administrative law judge found that while St. Francis pays property taxes for the leased parcel ($28,000 per annum), these are reimbursed through its administration and operation (A&O) costs. St. Francis also pays a pro rata allocation of local improvement district (LID) assessments in the total amount of $60,000. The judge of the Superior Court, who reviewed this case in an appellate capacity, noted that both parties agreed at oral argument that the $60,000 is borne by St. Francis; the parties on appeal agree that this $60,000 is properly reimbursed as a part of St. Francis' return on investment allowance.

After leasing the 4.5 acres, St. Francis built a nursing home and commenced operating it on April 10, 1985. The parties herein have stipulated that the lease was an arm's-length transaction; there is no contention that the lessors and St. Francis are related organizations.

In an administrative hearing, St. Francis challenged DSHS' computation of its return on investment allowance. Both parties argued to the administrative law judge that St. Francis was entitled to a "financing allowance" which is a portion of its return on investment allowance based upon its lease expenditures. They disagreed, however, regarding

the methodology to be employed in determining the capitalized cost of the land. The administrative law judge found that St. Francis' adjusted net invested funds in land were $588,000. Both parties administratively appealed this decision and the administrative review judge reversed the administrative law judge and determined that the correct value of land upon which St. Francis' return on investment should be based was $69,572.73.

Pursuant to former RCW 34.04.130, St. Francis appealed the review judge's decision to the Superior Court. The Superior Court, in turn, reversed the administrative review judge and found that the capitalized cost of land to St. Francis was $770,451. The court then ordered DSHS to include that amount in the net invested funds for calculation of St. Francis' return on investment financing allowance.

DSHS appealed the Superior Court's decision to the Court of Appeals and that court certified the case to us. One issue is determinative.

ISSUE

In determining the "return on investment" portion of the Medicaid reimbursement for a nursing home built on leased land, should the "capitalized cost of land", referred to in RCW 74.46.530(1)(b) as part of the "financing allowance", be computed based upon the lessor's historical cost or should it be computed based upon the nursing home operator's capitalized cost of the lease?

DECISION

CONCLUSION. We conclude that for purposes of computing a nursing home operator's financing allowance, the capitalized cost of land is to be determined by looking to the lessor's historical cost of the property, which includes the acquisition costs and the costs of preparing the asset for use.

At the outset, we observe that since the administrative review judge's decision was an administrative adjudication,

the scope of our review is governed by former RCW 34.04.130(6),[2] which provided as follows:

The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decision are:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

(f) arbitrary or capricious.

■■ Interpretation of a statute governing reimbursement rates and the regulations implementing same is purely a question of law; we review it under the "error of law" standard of former RCW 34.04.130(6)(d).[3] Under this standard, we may substitute our judgment for that of the administrative body, although substantial weight will, of course, be accorded to an agency's interpretation of the law.[4]

The Medicaid program is a federal program administered by the State under which the State of Washington and the federal government share the cost of nursing home care for Medicaid patients.[5] A nursing home contractor's rights

---

[2]*Whidbey Island Manor, Inc. v. Department of Social & Health Servs.*, 56 Wn. App. 245, 249, 783 P.2d 109 (1989).

[3]*Whidbey*, 56 Wn. App. at 249; *Clark v. Horse Racing Comm'n*, 106 Wn.2d 84, 88, 720 P.2d 831 (1986).

[4]*Whidbey*, 56 Wn. App. at 250; *Clark*, 106 Wn.2d at 88; *Mason Cy. v. Public Empl. Relations Comm'n*, 54 Wn. App. 36, 40, 771 P.2d 1185, *review denied*, 113 Wn.2d 1013 (1989); *Public Hosp. Dist. 1 v. Department of Social & Health Servs.*, 42 Wn. App. 298, 300, 712 P.2d 298 (1985).

[5]*Wilder v. Virginia Hosp. Ass'n*, ___ U.S. ___, 110 L. Ed. 2d 455, 110 S. Ct. 2510 (1990); *Diversified Inv. Partnership v. Department of Social & Health Servs.*, 113 Wn.2d 19, 21, 775 P.2d 947 (1989).

arise primarily from the state plan and the operator's contract with the State.[6] 42 U.S.C. 1396a(a)(13)(A) states (in part) that "[a] State plan for medical assistance must . . . provide— . . . for payment . . . of the . . . nursing facility . . . services, . . . provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .)". So long as provider reimbursement methods comply with federal Medicaid statutes and regulations, the participating states have latitude to make policy decisions as to which methods best suit their needs.[7] Congress has decided that state reimbursement rates must be reasonable, but it has afforded states great flexibility in calculating those reasonable rates.[8] No argument is here advanced that the state statutes fail to comply with federal law.[9]

Nursing home providers receive cost reimbursement payments pursuant to Washington statute (RCW 74.46). This chapter of our code divides reimbursement into five cost centers: administration and operation, nursing services, food, property, and return on investment.[10] The "return on investment" allowance is composed of two parts, a "financing allowance" and a "variable return allowance". RCW

[6]*In re Madeline Marie Nursing Homes*, 694 F.2d 433, 441 (6th Cir. 1982); *Troutman v. Cohen*, 588 F. Supp. 590 (E.D. Pa. 1984), *aff'd*, 755 F.2d 924 (3d Cir. 1984).

[7]*Madeline*, 694 F.2d at 442. *See also* 3 Medicare & Medicaid Guide (CCH) ¶ 14,724, at 6390 (1989).

[8]*Wilder*, 110 S. Ct. at 2512.

[9]St. Francis was a class member of a lawsuit in federal court challenging Washington's reimbursement system to determine its compliance with federal law. The federal court recently determined that Washington's reimbursement rates are reasonable and adequate, and do not violate federal law. See Findings of Fact and Conclusions of Law and Judgment in Folden v. Department of Social and Health Services, No. C87–802TB (W.D. Wash. Apr. 6, 1990).

[10]*Diversified*, 113 Wn.2d at 21.

74.46.530. The interpretation of St. Francis' "financing allowance" is at issue in this case.

RCW 74.46.530 provides in relevant part as follows:

**Return on investment allowance—Review.** (1) The department shall establish for individual facilities return on investment allowances composed of two parts: A financing allowance and a variable return allowance.

(a) The financing allowance shall be determined by multiplying the net invested funds of each facility by .11, and dividing by the contractor's total patient days. . . .

(b) In computing the portion of net invested funds representing the net book value of tangible fixed assets, the same assets, depreciation bases, lives, and methods referred to in RCW 74.46.330, 74.46.350, 74.46.360, and 74.46.370, including owned and leased assets, shall be utilized, except that the capitalized cost of land upon which the facility is located and such other contiguous land which is reasonable and necessary for use in the regular course of providing patient care shall also be included. In the case of leased facilities where the net invested funds are unknown or the contractor is unable to provide necessary information to determine net invested funds, the secretary shall have the authority to determine an amount for net invested funds based on an appraisal conducted according to RCW 74.46.360(1).

RCW 74.46.360 provides in part:

**Depreciation base.** (1) The depreciation base shall be the historical cost of the contractor or lessor, when the assets are leased by the contractor, in acquiring the asset in an arm's-length transaction and preparing it for use, less goodwill, and less accumulated depreciation . . . If the department challenges the historical cost of an asset, or if the contractor cannot or will not provide the historical costs, the department will have the department of general administration, through an appraisal procedure, determine the fair market value of the assets at the time of purchase. The depreciation base of the assets will not exceed such fair market value.

RCW 74.46.410(2)(hh) provides:

Unallowable costs include . . . the following:

. . .

All rental or lease costs other than those provided in RCW 74.46.300 on and after the effective date of RCW 74.46.510 and 74.46.530;[11]

---

[11]RCW 74.46.300 refers only to the lease of office equipment.

RCW 74.46.530 substantially changed prior statutory reimbursement methods.[12] No appellate court in this state has as yet interpreted the statutory provisions applicable to this particular land lease.

The following statutory definitions are also relevant to our interpretation of the foregoing provisions:

> "Net invested funds" means the *net book value* of tangible fixed assets employed by a contractor to provide services under the medical care program, including land, buildings, and equipment as recognized and measured in conformity with generally accepted accounting principles . . .

(Italics ours.) RCW 74.46.020(29) (part).

> "Net book value" means the *historical cost* of an asset less accumulated depreciation.

(Italics ours.) RCW 74.46.020(28).

> "Historical cost" means the actual cost incurred in acquiring and preparing an asset for use, including feasibility studies, architect's fees, and *engineering studies.*

RCW 74.46.020(22).

> "Capitalization" means the recording of an *expenditure* as an asset.

(Italics ours.) RCW 74.46.020(9).

St. Francis argues that the "capitalized cost of land" referred to in RCW 74.46.530 means the capitalized cost of its lease. Its certified public accountant testified that the capitalized cost of the 50–year lease with $75,000 annual lease costs calculated at 10.5 percent is $710,451 when utilizing financial accounting standards. While the administrative law judge and administrative review judge both disagreed with this statutory interpretation, the Superior Court did agree with it.

This argument essentially reads the section of RCW 74.46.530(1)(b) which states "except that the *capitalized cost of land* upon which the facility is located . . . shall also be included" (italics ours) without reference to either the preceding or succeeding language of that section of the

---

[12]*See Whidbey Island Manor, Inc. v. Department of Social & Health Servs.,* *supra* (interpreting "return on equity" under prior law).

statute. The administrative law judge observed that the Legislature had apparently decided that contractors who leased assets may not step up the value of the return basis or depreciation base from the lessor's acquisition cost inferentially, because that is deemed to artificially inflate "return on investment".

The statute is very clear in at least one respect, and that is that a lessee's depreciation base is the *lessor's* historical cost of a depreciable asset.[13] While land is not a depreciable asset,[14] the statute does not appear to treat leased land differently from a leased building (or other depreciable asset) for purposes of the *financing allowance* portion of the return on investment. Nor is there any apparent reason to treat a building lease and a land lease differently for reimbursement of a financing allowance. The financing allowance is calculated by multiplying the *net invested funds* by .11 and then dividing by the contractor's total patient days.[15] "Net invested funds" are defined as "net book value" and "net book value" is defined as "historical cost of an asset." "Historical cost" means the actual cost incurred in acquiring and preparing an asset for use. This supports the conclusion that the capitalized cost of land is based on the *lessor's historical cost.*

The last sentence of RCW 74.46.530(1)(b) provides:

> In the case of leased facilities where the net invested funds are unknown or the contractor is unable to provide necessary information to determine net invested funds, the secretary shall have the authority to determine an amount for net invested funds based on an appraisal conducted according to RCW 74.46.360(1).

The depreciation base section is RCW 74.46.360. Since subsection .360 refers to depreciation base as the historical cost to the *lessor* and provides for an appraisal value based upon fair market value at the time of *purchase* (as an

---

[13]RCW 74.46.530; RCW 74.46.360(1).

[14]RCW 74.46.340.

[15]RCW 74.46.530(1)(a).

alternate basis if the lessor's historical cost is unknown), DSHS would have us interpret "capitalized cost of land" to mean the historical cost to the lessor. St. Francis argues, however, that the last sentence (quoted just above) should not be applicable because land is not part of a "facility" as defined. While it is possible to so argue, given the context it is a somewhat strained interpretation. Even if the word "facility" is determined to mean the nursing home absent the land it is built upon, the first section of the statute (read with the definitions) indicates that "capitalized cost of land" must be determined based upon the lessor's historical cost.

A number of sections of the Washington Administrative Code (WAC) support the arguments of DSHS in this regard.

Former WAC 388–96–754 (1986)[16] states in part as follows:

**A contractor's return on investment.** (1) The department shall establish for individual Medicaid facilities return on investment allowances composed of a financing allowance and a variable return allowance.

(2)(a) The financing allowance shall be determined by multiplying the net invested funds of each facility by eleven percent and dividing by the contractor's total patient days. . . .

(b) In computing the portion of net invested funds representing the net book value of tangible fixed assets, the same assets, depreciation bases, lives, and methods referred to in this chapter, including owned and leased assets shall be used, except the capitalized cost of land upon which a facility is located and other such contiguous land which is reasonable and necessary for use in the regular course of providing patient care shall also be included. In the case of leased facilities where the net invested funds are unknown or the contractor is unable or unwilling to provide necessary information to determine net invested funds, the department may determine an amount to be used for net invested funds based upon an appraisal conducted by the department of general administration pursuant to this chapter.

---

[16]Although WAC 388–96–754 has been amended four times since 1984, none of the changes relate to or provide guidance regarding the issues presented in this case.

WAC 388–96–752 provides:

**Documentation of leased assets.** If the department challenges the historical cost of a leased asset or if the contractor cannot or will not provide the lessor's acquisition cost of an asset, the asset will be excluded from reimbursement until a department of general administration appraisal is prepared for the asset.

WAC 388–96–767 provides:

**Appraisal values.** If a contractor is unwilling or unable to provide and document the lessor's historical cost of leased assets, the department shall arrange for an appraisal of such assets to be conducted by the state of Washington department of general administration. If such an appraisal is conducted, it shall be the basis *for all* property and *return on investment reimbursement,* except that: *If documentation subsequently becomes available to the department establishing the lessor's historical cost is less than the appraisal value, the historical cost shall be the basis for all property and return on investment reimbursement.*

(Italics ours.)

Another section, WAC 388–96–559, indicates that even in reimbursement for leased *land* (a nondepreciable asset) the lessor's historical basis (or fair market value at the time of *lessor's* acquisition) is the relevant inquiry. That section (former WAC 388–96–559 (1986)) provides in pertinent part:

**Depreciation base.** (1) Effective January 1, 1985, the total depreciation base shall be the lowest of the contractor's appraisal, if any, the department's appraisal obtained through the department of general administration of the state of Washington, if any, or the historical cost of the contractor, *or lessor if the assets are leased by the contractor,* in acquiring the asset in an arm's–length transaction, and preparing the asset for use, less goodwill, and less accumulated depreciation . . . If the department challenges the historical cost of an asset or if the contractor cannot or will not provide the historical cost of a leased asset, the department will have the fair market value of the asset at the time of purchase established by appraisal through the department of general administration of the state of Washington. The contractor may allocate or reallocate values among land, building, improvements, and equipment in accordance with the department's appraisal. For leased assets, the department may examine documentation in its files

to determine the lessor's acquisition date at the time of the last arm's–length transaction.

 . . .
(5) If a contractor cannot or will not provide the *lessor's acquisition cost of assets leased by the contractor,* the appraised asset value of *land,* building, or equipment, determined by the department of general administration shall be adjusted by the department using the *Marshall and Swift Valuation Guide* to reflect the value at the *lessor's acquisition date.*

(Italics ours.) Although this section (WAC 388–96–559) is generally discussing the depreciation base of assets, subsection (5) thereof lends some further support to the conclusion that in reimbursement for leased land costs, the historical cost to the *lessor* is the proper measure.

█ Because we are using these regulations to help resolve this controversy, it is first necessary to enunciate the standard of review used with regard to administrative regulations. RCW 74.46.800 provides authority to DSHS to promulgate administrative rules to carry out the policy and purpose of RCW 74.46. Where the Legislature has specifically delegated the power to make regulations to an administrator, such regulations are presumed to be valid. The burden of overcoming this presumption rests on the challenger, and judicial review will be limited to a determination of whether the regulation in question is reasonably consistent with the statute being implemented.[17] The wisdom or desirability of such rules is not before the court.[18]

St. Francis argues that RCW 74.46.190(4) shows a legislative intent to reimburse lessees and purchasers in the same manner. This section provides that "[b]eginning January 1, 1985, the payment for property usage is to be independent of ownership structure and financing arrangements." The section can be interpreted to mean that the

---

[17]*Federated Am. Ins. Co. v. Marquardt,* 108 Wn.2d 651, 654–55, 741 P.2d 18 (1987); *Pacific Wire Works, Inc. v. Department of Labor & Indus.,* 49 Wn. App. 229, 234, 742 P.2d 168 (1987).

[18]*American Network, Inc. v. Utilities & Transp. Comm'n,* 113 Wn.2d 59, 71, 776 P.2d 950 (1989).

reimbursement amount will be independent of ownership in that reimbursement will be based on the *last purchase price*—regardless of whether the contractor is the owner. Therefore, historical cost of the owner (*i.e.*, the lessor in the case of leased land) would be the figure utilized for reimbursement purposes.

St. Francis argues that reimbursement under the "financing allowance" for leased land based on the lessor's historical basis causes a smaller reimbursement to a lessee than to a purchaser. This may well be the case, particularly when a lessor has owned the property for a period of time. However, the "*financing allowance*" is a portion of the "return on investment allowance" and is based upon "net *invested* funds". The statutory scheme appears from these terms to depend upon the amount of funds *invested.* Lease payments are specifically named as *unallowable* costs.[19] The difference in treatment between purchasers and lessees may well reflect the fact that a purchaser probably has at least some of his or her money *invested* in the purchase of the property and is likely paying interest on borrowed funds. The lessee may also well have little or no equity at risk and no financing costs. The difference in reimbursement for the "financing allowance" between purchasers and lessees may thus reflect the lesser financial stake of the lessee. Limiting the financing allowance by utilizing the lessor's historical cost of property, therefore, may reflect a legislative intent to encourage investment and reimburse a contractor based upon the amount of invested funds.

St. Francis argues that general accounting methods can be used to supplement the regulations and the statute. We agree. WAC 388–96–113(2) provides in part that "[i]f no specific regulation, manual provision, or instruction covers a situation, generally accepted accounting principles shall be followed." Thus, by the terms of this section, generally accepted accounting methods are used in the *absence* of regulations; they are not used to *contradict* regulations.

---

[19]RCW 74.46.410(2)(hh).

The certified public accountant for St. Francis has "capitalized the lease" to compute the financing allowance in accord with generalized accounting methods. DSHS' position, however, is that such computation results in general accounting methods being used *in spite of* regulations directing otherwise. We agree. There is no authority in the pertinent statutes or regulations that would allow lease payments to be capitalized in any way to allow the leased asset to be booked as an owned asset by a lessee.

RCW 74.46.020(9) defines "capitalization" as the recording of an *expenditure* as an asset.[20] In a lease situation, the lease payments have not yet been expended. The statute and regulations thus indicate that the "expenditure" relating to leased land which may be booked as an asset for reimbursement of a *financing* allowance is the lessors' historical cost. It is the lessor who incurred financing costs for the purchase of the property and it is upon that cost that the financing allowance is reimbursed.

The administrative law judge recognized that the general rule is that the capitalized cost of leased assets is limited to the *lessor's* historical cost. However, he also reasoned that this rule should not be applied because, although the land conveyance was in the form of a lease, "in substance and legislative intent it should be treated as a purchase." There is no authority in the applicable statutes and regulations which would allow a long term *lease* to be treated as a *purchase*. Such an enhancement of the statutory language would raise a number of questions, such as how long the term of a lease would have to be before it would be "deemed" by a judicial officer to be a purchase. Courts may not read into statutes that which is not there;[21]

---

[20]*See also* WAC 388–96–010(11).

[21]*State v. Keeney,* 112 Wn.2d 140, 142, 769 P.2d 295 (1989); *King Cy. v. Seattle,* 70 Wn.2d 988, 991, 425 P.2d 887 (1967).

we conclude that the administrative law judge impermissibly added to the statute. The statutes define a lease agreement as "a contract between two parties for the possession and use of real or personal property or assets for a specified period of time in exchange for specified periodic payments." RCW 74.46.020(25) (part). Nothing in the pertinent statutes or regulations refers to the length of a lease agreement.

The administrative law judge rejected St. Francis' argument that capitalized cost of land should be valued by the capitalized cost of the lease and determined that fair market value of comparable land (not near a hospital) should be utilized to determine the net invested funds in land. The administrative law judge concluded that St. Francis had paid for a "premium" location which was not necessary to provide care for Medicare recipients and therefore adjusted the amount based on the "best evidence of necessary land costs". Again, we find no authority in the statutes or regulations for such a conclusion.

The administrative review judge reversed the administrative law judge's decision and essentially agreed with DSHS' argument that the statute and regulations mandate that the land reimbursement portion of the financing allowance be based upon the lessor's historical cost of the property. Since "historical cost" includes both the actual cost incurred in acquiring the asset and the cost of preparing the asset for use,[22] the administrative review judge also included the LID payments for costs of installing street signals and for an alternate access road in the reimbursement computation. If St. Francis could show other costs spent by the lessors in preparing the land for use, those costs should also be included in the historical basis. St. Francis says that the lessors were secretive about their

[22]RCW 74.46.020(22).

business affairs and therefore other costs could not be documented. Only documented costs are allowed for reimbursement.[23] On remand, St. Francis should be afforded an opportunity to present any available information on costs of preparing the land for use.

The Superior Court reversed the administrative review judge's decision and agreed with St. Francis that the "capitalized cost of land" means the capitalized cost of the lease for purposes of reimbursing St. Francis under the "financing allowance". The court held that RCW 74.46.360 applies only to depreciable assets and since land is not depreciable, that section is inapplicable. Such an interpretation depends heavily on reading the word "facility" in subsection .530 to exclude land and ignores the above quoted regulations. Although WAC 388–96–559 primarily addresses depreciable property, it also provides that if a *lessor's* acquisition cost of *land* is unavailable, then the fair market value of the land at the time of the lessor's acquisition is to be used. More importantly, the Superior Court's decision does not consider the statutory definitions of "net invested funds", "net book value", "historical costs", and "capitalization".

For purposes of "return on investment" payments, we conclude that the reimbursement of leased assets such as buildings and equipment should be valued by looking to the lessors' historical cost.[24] No persuasive reason has been presented, or is apparent from the statutes, as to why leased land should be treated differently for purposes of computing the "financing allowance" portion of the "return on investment".

The fact that the administrative law judge, the administrative review judge and the Superior Court reached such disparate results in this case, and based them upon different legal theories, well attests to the tangled skein which the statutory and regulatory scheme presents. However,

---

[23]RCW 74.46.190; WAC 388–96–585.

[24]RCW 74.46.530; RCW 74.46.360.

after careful consideration of the statutory language, definitions and the administrative regulations, and having in mind the deference which we accord to an agency's interpretation of statutes it is charged with administering,[25] we conclude that the capitalized cost of land component of the financing allowance is based upon the lessors' historical cost of land. It is not within the judicial scope of review for us to second–guess the wisdom of a legislative scheme, especially in the area of economic regulation.[26] Any perceived inequities should be commended to the legislative process.

Because of the demonstrated confusion regarding this issue, we remand the case for the purpose of determining the proper financing allowance in light of our decision herein. Since "historical cost" includes not only the cost incurred in acquiring the asset but also the cost of preparing the asset for use,[27] St. Francis may be able to provide additional information to assist in the determination of the costs incurred in preparing the property for use.

The Superior Court judgment is reversed and the case is remanded to the Superior Court with directions that it be returned to the administrative agency for a new determination of the financing allowance in accordance with this decision.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, DURHAM, SMITH, and GUY, JJ., concur.

Reconsideration denied February 11, 1991.

---

[25]*Cosro, Inc. v. Liquor Control Bd.*, 107 Wn.2d 754, 757, 733 P.2d 539 (1987); *Whidbey Island Manor, Inc. v. Department of Social & Health Servs.*, 56 Wn. App. 245, 250, 783 P.2d 109 (1989); *Clark v. Horse Racing Comm'n*, 106 Wn.2d 84, 88, 720 P.2d 831 (1986); *Public Hosp. Dist. 1 v. Department of Social & Health Servs.*, 42 Wn. App. 298, 300, 712 P.2d 298 (1985).

[26]*Federated Am. Ins. Co. v. Marquardt*, 108 Wn.2d 651, 658, 741 P.2d 18 (1987); *American Network, Inc. v. Utilities & Transp. Comm'n*, 113 Wn.2d 59, 79, 776 P.2d 950 (1989).

[27]RCW 74.46.020(22).